**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**No. 99-41382**

**NAPOLEON BEAZLEY,**

**Petitioner-Appellant,**

**versus**

**GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF**
**CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

**Appeal from the United States District Court**
**for the Eastern District of Texas**

February 9, 2001

Before SMITH, WIENER, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Included in the numerous issues before us, which primarily challenge the Texas death-penalty system, are several that concern whether Napoleon Beazley can be executed for committing a capital murder when he was almost, *but not yet*, age 18. Such effect *vel non* of Beazley's age, however, is *not* included in the one issue (standard of review) for which the district court granted a certificate of appealability (COA). Restated, the certified issue is the *only* one before us on the merits; for the specific age-related issues, we must first decide whether a COA should be granted for any of them.

The certified issue concerns the appropriate federal habeas standard of review, under 28 U.S.C. § 2254(d)(1), for state court judgments; fortunately, that standard was clarified recently in *Williams v. Taylor*, 120 S. Ct. 1495 (2000). Beazley asks us to grant a COA for each of numerous other issues, including whether his execution is precluded by his age at the time of the murder. The denial of habeas relief is **AFFIRMED;** each requested COA is **DENIED.**

I.

In June 1994, Beazley and two others, Cedric and Donald Coleman, were arrested for the April 1994 capital murder of John Luttig. In March 1995, a jury found Beazley guilty of that offense. After the punishment hearing, Beazley was sentenced to death, because the jury answered the three statutory special interrogatories as follows: "yes" for whether Beazley probably would commit criminal acts of violence that would constitute a continuing threat to society; "yes" for whether he actually caused the death of John Luttig; and "no" for whether, taking into consideration all the evidence, including the circumstances of the offense, Beazley's character, background, and personal moral culpability, sufficient circumstances warranted a life, rather than a death, sentence. TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2 (Vernon Supp. 2001).

On direct appeal, the Texas Court of Criminal Appeals affirmed, stating in part:

> [Beazley] was thinking about stealing a car for at least two weeks prior to the ... [murder]. He even indicated to ... friends that he might soon be driving a Mercedes to school. On the evening of April 18, 1994, ... [Beazley] told Cedric [Coleman] he wanted to steal a car.... [Beazley] carried a gun with him in order to facilitate the crime.... Cedric [Coleman] resisted the idea, ... [and] managed to talk [Beazley] into waiting another day.
>
> The next night, April 19th, intent on carrying out his plan, [Beazley] borrowed his mother's car and brought along a loaded .45-caliber Haskell semi-automatic pistol which he kept near his person and a sawed-off shotgun which was accessible from the back seat. He then picked up [Cedric and Donald Coleman], and ... proceed[ed] toward Tyler[, Texas].
>
> [After an unsuccessful attempt to carjack a Mercedes at a restaurant in Tyler, Cedric Coleman, who was driving, departed] Tyler for home.... [Beazley] ordered Cedric [Coleman] ... to turn around and return to Tyler because he ([Beazley]) wanted to steal a car and "wanted to see what it [was] like to kill somebody." In "suggesting" that Cedric [Coleman] turn the car around and return to Tyler, [Beazley] commented, "You know, I guess I'm going to have to shoot my driver." Cedric [Coleman] then ... told [Beazley] that, under the circumstances [Beazley] would have to do his own driving, which [Beazley] did....
>
> [Beazley] followed [Mr. and Mrs. John] Luttig[][, who were driving a ten-year-old Mercedes,] to their home .... [He] got out of the car and stripped off his shirt. Armed with the .45-caliber pistol, [Beazley] shouted, "the shit is on." ... [Beazley], who was a power lifter able to bench press 300 pounds, grabbed the 170 pound, 63-year-old victim [John Luttig] and threw him to the

3

ground. [Beazley] then fired one round from his pistol, hitting the victim in the side of the head, leaving him alive, but stunned. [Beazley] next ran around the car to where Mrs. Luttig was getting out of the vehicle and fired at her at very close range, but missed her. She fell to the ground. Apparently believing her to be dead, [Beazley] then returned to the first victim, raised his gun, took careful aim, and fired point blank into John Luttig's head. Standing in his victim's blood, [Beazley] then rifled Luttig's pockets looking for the keys to the Mercedes.

[Donald Coleman, carrying the shotgun, had followed Beazley into the Luttigs' garage.] As he searched for the keys, [Beazley] asked Donald [Coleman] if Mrs. Luttig was dead. When Donald [Coleman] said she was still moving, [Beazley] shouted for him to "shoot the bitch," but Donald [Coleman] refused. [Beazley] then moved to shoot her, but Donald [Coleman] quickly recanted his previous statement and said that she was dead.... [As Beazley drove the Mercedes away, he damaged it, so he and Donald Coleman were forced to abandon it.] After he was back in his mother's [vehicle], [Beazley] stated that "he would get rid of" anyone who said anything about the incident....

[Beazley] later commented, in describing his experience of the carjacking and murder, that, "[it] was a trip."...

These facts reveal both forethought in committing this crime and a deliberate execution thereof. Moreover, they reveal not just the intention to commit an offense, but a dangerous self-indulgent drive to kill for the sake of killing; just to see how it felt. [Beazley]'s self-indulgent motivation further reveals a wanton disregard and disrespect for human life. His remorseless comments and behavior after the murder further show that his desire to kill continued unabated....

While the facts of the offense alone might well support the jury's affirmative

4

finding that [Beazley] *would be a continuing threat to society*, the State presented other evidence ... that [Beazley] had developed a morbid preoccupation with death and murder. For instance, the jury was told about a message [Beazley] deemed was appropriate for his answering machine which stated: "Napoleon's Mortuary, you stab 'em, we bag 'em." Cedric [Coleman] also testified that when a person would call [Beazley]'s answering machine he would first hear a lot of gunshots, followed by a person screaming and getting killed, and then [Beazley] would speak. Additional evidence was presented concerning [Beazley]'s expressed desire to enlist in the Marine Corps in order to learn to be a "trained killer." Finally, on the afternoon of April 18th, the first night [Beazley] expressed to Cedric [Coleman] that he wanted to steal a car, [Beazley] watched "Faces of Death," a movie depicting the deaths of real people in real life situations.

Additionally, ... [Beazley] carried a weapon, presumably in order to protect his long-standing drug-dealing business....

*Beazley v. Texas*, No. 72,101 (Tex. Crim. App. 26 Feb. 1997) (unpublished) (emphasis added; footnote omitted).

Subsequently, based on the trial court's findings of fact and conclusions of law, *Ex parte Beazley*, Writ Cause No. 4-94-226-A (Smith County, Tex. 31 Oct. 1997) (unpublished), the Court of Criminal Appeals denied Beazley's state habeas application as well, *Ex parte Beazley*, Writ No. 36,151-01 (Tex. Crim. App. 21 Jan. 1998) (unpublished order).

In his federal habeas petition, Beazley raised 24 claims. Although the district court found all but seven and a portion of another procedurally barred, it also considered, and rejected, each

5

claim on the merits.  *Bea[z]ley v. Director, TDCJ-ID*, No. 1:98-CV-1601 (E.D. Tex. 30 Sept. 1999) (unpublished).

Pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1217 (1996), a petitioner must obtain a COA in order to appeal a denial of habeas relief. *See* 28 U.S.C. § 2253(c)(1)(A).  The district court denied Beazley a COA for each of the numerous issues, except one:  the appropriate standard of review for 28 U.S.C. § 2254(d)(1) (bases upon which federal habeas relief may be awarded a state prisoner), an issue then pending before the Supreme Court in *Williams*.  (As noted, *Williams* was decided recently.)  Notwithstanding its awarding a COA for the standard of review, the district court observed:  even under "the more lenient standard ... [Beazley] propose[d], it would *not* change [its] decision ... concerning the merits of the claims presented".  *Beazley v. Director, TDCJ-ID*, No. 1:98-CV-1601 (E.D. Tex. 28 Dec. 1997) (unpublished) (emphasis added).

## II.

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998).  The only certified issue is addressed first; then those issues for which Beazley requests a COA; then those two issues for which a hearing is requested.

6

A.

Federal habeas relief shall *not* be granted for

> any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an *unreasonable* determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

In **Williams**, the Court explained that *independent meaning* must be given § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. **Williams**, 120 S. Ct. at 1519. For the "contrary to" clause:

> A state-court decision will certainly be *contrary to* our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases ... [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Id.* at 1519-20 (emphasis added). A "run-of-the-mill state-court decision applying the correct legal rule" would *not* fit within this exception as "diametrically different" or "opposite in character or nature" from Supreme Court precedent. *Id.* at 1520.

7

However, under the "unreasonable application" clause:

> A state court decision that correctly identifies the governing legal rule but applies it *unreasonably* to the facts of a particular prisoner's case certainly would qualify as a decision "involv[ing] an *unreasonable application of* ... clearly established Federal law."

*Id.* at 1520 (emphasis added). It further explained:

> Under § 2254(d)(1)'s "*unreasonable application*" clause, then, a federal habeas court may *not* issue the writ simply because that court concludes *in its independent judgment* that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Rather, that application must also be unreasonable*.

*Id.* at 1522 (emphasis added).

Of particular relevance for our court is the Supreme Court's definition of an "unreasonable application" of law. The Court criticized our court's application, in **Drinkard v. Johnson**, of an apparently *subjective* "reasonable jurist" standard. *See* **id.** (citing **Drinkard v. Johnson**, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997)).

> Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law *was objectively unreasonable*. The federal habeas court should *not* transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. *The "all reasonable jurists" standard*

8

> *would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.*

*Id.* at 1521-22 (emphasis added).

Beazley requests that, in the light of the standard articulated by *Williams*, we grant a COA or, in the alternative, remand the exhausted issues to the district court for appraisal under the new standard.

In noting the application of § 2254(d) to Beazley's habeas claims, the district court cited *Drinkard*; but, in ruling on those claims, it did *not* discuss, or otherwise indicate it utilized, the now-rejected *Drinkard* rule. While it appears that the district court failed to give the now-requisite *independent meaning* to § 2254(d)(1)'s "contrary to" and "unreasonable application" provisions, it does *not* appear that it applied a *subjective*, rather than the proper *objective*, standard of unreasonableness. In any event, any error in the district court's application of the standard of review was harmless because, as further discussed below, it reached the correct outcome. *Cf. Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995) (application of incorrect legal standard harmless if conclusion unchanged), *cert. denied*, 516 U.S. 1059 (1996).

The § 2254(d) standard of review applies *only* to claims adjudicated by state courts *on the merits*. As discussed *infra*, under § 2254(d)(1), as defined in *Williams*, the state court's

rejection on the merits of seven of Beazley's habeas claims (the exhausted claims) was *neither* contrary to, *nor* an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Therefore, for the one issue certified by the district court, we affirm the denial of habeas relief.

1.

In his state habeas petition, Beazley asserted that his appellate counsel's failure to contest the admission of evidence of John Luttig's (the victim's) good character constituted ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. The state court concluded: the testimony was *not* direct evidence of the victim's good character, but instead an explanation of the impact on his family; and appellate counsel was *not* ineffective for "failing" to assign error to a groundless issue that might have injured the credibility of other issues raised on direct appeal.

The admission of victim impact testimony *at the punishment phase* does *not* violate the Constitution *unless* the remarks so infect the sentencing proceedings as to render the result fundamentally unfair. *See* **Payne v. Tennessee**, 501 U.S. 808, 825 (1991). The district court concluded: the *guilt-phase testimony* related to how the witnesses knew John Luttig; the *punishment-phase testimony* was proper victim impact testimony; and Beazley failed to

10

demonstrate a denial of due process.  The district court held the state court findings were *not* contrary to established law.

The trial judge was aware of the bar on victim good character evidence, as demonstrated by its granting a motion *in limine* requiring counsel to approach the bench before offering any evidence of the victim's character and sustaining an objection to the form of a question asked John Luttig's daughter.  The subject testimony at the guilt and punishment phases was *not* improper.

2.

Beazley raises several challenges to the constitutionality of the Texas death penalty statute.  The statute's history is helpful background both to the issues raised in state court (discussed here in part II.A) and to those raised for the first time in federal court (discussed in part II.B.1).  The statute has come before the Supreme Court on multiple occasions as the Court,

> [i]n the years since *Furman v. Georgia*, 408 U.S. 238 (1972), has struggled to harmonize[] two competing commandments of the Eighth Amendment.  On the one hand, as *Furman* itself emphasized, the States must limit and channel the discretion of judges and juries to ensure that death sentences are *not* meted out wantonly or freakishly.  On the other, ... States must confer on the sentencer sufficient discretion to take account of the character and record of the individual offender and the circumstances of the particular offense to ensure that death is the appropriate punishment in a specific case.

*Graham v. Collins*, 506 U.S. 461, 468 (1993) (emphasis added; internal quotations marks and citations omitted).

11

In 1976, in **Jurek v. Texas**, the Supreme Court upheld the constitutionality of an earlier version of the Texas death penalty statute. 428 U.S. 262, 269, 276 (1976) (plurality opinion) (citing TEX. CODE CRIM. PROC. art. 37.071 (Vernon Supp. 1975-76)). Under that statute, the jury considered: (1) whether the conduct of the defendant was committed deliberately and with the reasonable expectation death would result; (2) whether the probability of future violence and a continuing threat to society existed (future dangerousness); and (3) whether defendant was unreasonably provoked. **Id.** at 269 (plurality opinion). The Court determined that, although the statute did "*not* explicitly speak of mitigating circumstances", *id*. at 272 (plurality opinion) (emphasis added), it assured that the jury had before it "all possible relevant information about the individual defendant whose fate it must determine". **Id.** at 276 (plurality opinion).

In **Franklin v. Lynaugh**, the Court considered whether the Texas special issues prevented adequate consideration of the defendant's clean prison disciplinary record. 487 U.S. 164 (1988). A plurality rejected the challenge, finding: "In resolving the second Texas Special Issue [future dangerousness] the jury was surely free to weigh and evaluate petitioner's disciplinary record as it bore on his 'character' ... as measured by his likely future behavior". **Id**. at 178 (plurality opinion).

12

Then, in 1989, the Court in **Penry v. Lynaugh** overturned a death sentence, concluding that Texas' special issues failed to provide the jury a genuine opportunity to give mitigating effect to a defendant's mental retardation and abused childhood. 492 U.S. 302, 328 (1989). It reasoned: this evidence had only aggravating relevance to future dangerousness (special issue two), even though it might diminish a defendant's blameworthiness; it might *not* be reflected in the first special issue (deliberate action); and it could *not* be considered under the third (provocation). *Id.* at 322-24. Therefore, the defendant was constitutionally entitled to further instructions that would allow the jury to give effect to his mitigating evidence. *Id.* at 328. The Court stated that, because this holding was "dictated by" its capital-case precedent, *id*. at 319, it was *not* making a new rule under **Teague**. *Id.* at 318-19 (citing **Teague v. Lane**, 489 U.S. 288, 301 (1989)).

Later, in **Graham**, the Court observed: "We do *not* read **Penry** as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issues framework". **Graham**, 506 U.S. at 474 (emphasis added). It concluded that the focus remained on whether the sentencer had a reliable means of giving mitigating effect to the evidence or if it had been placed beyond the jury's effective reach. *Id.* at 475.

Finally, in **Johnson v. Texas**, the Court held that the future

dangerousness special issue allowed adequate consideration of youth. 509 U.S. 350, 368 (1993). It reaffirmed that "States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty". *Id*. at 362 (internal quotation marks and citations omitted).

In the wake of ***Penry***, Texas amended its death sentencing statute, effective 1991. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071. Under § (2)(b) of the amended statute, the jury considers future dangerousness (previously issue 2); and, if the defendant has been charged as a party, it considers whether the defendant actually caused the death, or intended to cause or anticipated a death. Under § (2)(e), the jury is instructed that, if it answers "yes" to the previous issues, it must consider

> [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*Id.* § 2(e)(1). Subsection (f) requires an instruction that mitigating evidence is that which "a juror might regard as reducing the defendant's *moral blameworthiness*". *Id. §* 2(f)(4) (emphasis added).

The Texas Court of Criminal Appeals explained in ***McFarland v. Texas***, 928 S.W.2d 482, 520 (Tex. Crim. App. 1996) (en banc), *cert.*

14

*denied*, 519 U.S. 1119 (1997), that "[t]he inclusion of the mitigation issue in the present Texas scheme is merely a codification of the dictates of *Penry*". *Accord* ***Cantu v. Texas***, 939 S.W.2d 627, 645 (Tex. Crim. App.) (en banc) ("[O]ur statutory scheme has *not* radically changed from the version upheld in ***Jurek v. Texas*** except to incorporate the dictates of ***Penry***". (emphasis added; citations omitted)), *cert. denied*, 522 U.S. 994 (1997).

On direct appeal, Beazley asserted that the death penalty, at least as administered in Texas, was cruel and unusual punishment under the Eighth and Fourteenth Amendments, especially in the light of developments following the earlier-referenced ***Furman v. Georgia***, 408 U.S. 238 (1972) (juror discretion made death penalty system cruel and unusual punishment, violative of Eighth Amendment). The Texas Court of Criminal Appeals held its recent decisions were to the contrary, citing ***McFarland,*** 928 S.W.2d at 520-21, and ***Lawton v. Texas***, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995) (en banc), *cert. denied*, 519 U.S. 826 (1996).

The district court observed that the Supreme Court has held the Texas death penalty scheme does *not* violate the Eighth Amendment and rejected the claim as without merit, citing ***Jurek***.

Beazley contends that the state court decision regarding whether the Texas death penalty constituted cruel and unusual punishment was "contrary to" clearly established Supreme Court precedent because it "mischaracterize[d] at best the appropriate

15

rule". He fails, however, to elaborate on how this mischaracterization occurred. In any event, under the standard of review articulated by **Williams**, the state court ruling on this issue does *not* run afoul of § 2254(d)(1).

3.

Along this same line, Beazley maintained on direct appeal that the Texas statute's definition of "mitigating evidence" is facially unconstitutional because it limits "mitigation" to factors that render a capital defendant less morally "blameworthy" for commission of the capital murder. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(f). The Court of Criminal Appeals rejected Beazley's claim, stating it had recently decided the issue otherwise, again citing **McFarland**, 928 S.W.2d at 518, and **Lawton**, 913 S.W.2d at 555-56.

On state habeas, the court concluded that, in addition to the claim's *not* being subject to habeas relief because it had already been rejected on direct appeal, the claim was procedurally barred because it had *not* been raised in the trial court. In the alternative, it rejected the claim on the merits, concluding: the jury could consider evidence of prior good character when answering the special issues; and the instructions did *not* preclude it.

The district court concluded: in **Crank v. Collins**, 19 F.3d 172, 175 (5th Cir.), *cert. denied*, 512 U.S. 1214 (1994), this claim was held to be without merit because good character evidence is

16

within the effective reach of the jury under the future dangerousness special issue; and, in addition, **Crank** held the issue **Teague**-barred. *See* **id.**

**Crank** concerned the statute prior to its amendment in 1991. Beazley asserts that, because the statute has been amended, **Crank** does *not* control. He contends that the new mitigating evidence special issue and definition of "mitigating evidence", added in 1991 to subsection (f), preclude consideration of good character and community approbation.

As quoted earlier, "[Texas'] statutory scheme has *not* radically changed from the version upheld in **Jurek v. Texas**, except to incorporate the dictates of **Penry**". **Cantu**, 939 S.W.2d at 645 (emphasis added; citations omitted). In considering challenges to the definition of mitigating evidence as that which makes the defendant less morally blameworthy, the Texas court has repeatedly stated that *all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in Texas Code of Criminal Procedure article 37.071 § 2(e). *See* **Prystash v. Texas**, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999) (en banc) ("[S]ection 2(e) solves any potential narrowing problem in section 2(f)(4)[, instructing the jury to consider mitigating evidence to be that which reduces the defendant's moral blameworthiness,] ... [because] the trial court's instructions pursuant to section 2(e) provide the jury with a vehicle to respond to a broader range of mitigating

17

evidence".), *cert. denied*, 120 S. Ct. 1840 (2000); *see also* **Cantu**, 939 S.W.2d at 648-49 (by requiring jury to take into account all evidence, § 2(e) supports interpretation that § 2(f)(4) does *not* unconstitutionally narrow definition).

Likewise, our reading of the statute leads us to conclude that the amended statute does *not* unconstitutionally "preclude[] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death". **Lockett v. Ohio**, 438 U.S. 586, 604 (1978).

The definition of mitigating evidence does *not* limit the evidence considered under the third special issue (whether mitigating circumstances warrant a life, rather than a death, sentence). "[V]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues". **Graham**, 506 U.S. at 476 (emphasis added).

Furthermore, as noted, the future dangerousness special issue remains in the amended Texas statute. Our court has repeatedly concluded that, under that special issue, a jury could give effect to good character evidence. *See* **Nichols v. Scott**, 69 F.3d 1255, 1278 (5th Cir. 1995) ("At the least, the ... special issue concerning future dangerousness provide[s] an adequate vehicle for

18

the jury to give effect to this mitigating evidence, placing it within the effective reach of the sentencer, and there is *no* reasonable likelihood that the jury would have found itself foreclosed from thus considering it.  The Supreme Court and this Court have many times so held." (emphasis added)), *cert. denied*, 518 U.S. 1022 (1996); *see also* **Jacobs v. Scott**, 31 F.3d 1319, 1327 (5th Cir. 1994) (holding that "[a]s for [a defendant's] alleged positive character traits, a jury wishing to give effect to such traits could answer 'no' to the ... special issue regarding future dangerousness"), *cert. denied*, 513 U.S. 1067 (1995); **Black v. Collins**, 962 F.2d 394, 405 (5th Cir.) (denying certificate of probable cause for claim that Texas did *not* allow mitigating weight to be given good character evidence because jury could consider such evidence under future dangerousness special issue), *cert. denied*, 504 U.S. 992 (1992).

4.

On direct appeal, Beazley claimed that Texas' denial of appellate review of the third special issue (mitigating circumstances) caused the sentencing statute to operate in an unconstitutional manner.  The Court of Criminal Appeals rejected this claim.  **Colella v. Texas**, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995) (en banc), had held:  "Because the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror, we decline to review the evidence for

19

sufficiency"; and Beazley had *not* persuaded it to revisit that holding.

On state habeas, the court concluded the claim was procedurally barred from being raised as a state habeas issue because it had been raised on direct appeal. In the alternative, it held that meaningful appellate review of the sufficiency of mitigating evidence was part of analyzing the first special issue (future dangerousness).

In his federal habeas petition, Beazley focused on: the Texas court's interpretation of Texas Code of Criminal Procedure article 44.251(a) (instructing Court of Criminal Appeals to reform death sentence if evidence *insufficient* to support jury's answers to questions under articles 37.071 and 37.0711); and its decision to review the sufficiency of mitigating evidence under the future dangerousness, rather than the mitigation, special issue. The district court ruled: the Court of Criminal Appeals had applied a reasoned approach; and an error in the application of a state law does *not* assert a claim cognizable in federal habeas proceedings. *See* **Engle v. Isaac**, 456 U.S. 107, 119 (1982) ("Insofar as respondents simply challenge ... [the application of state] law, they allege *no* deprivation of federal rights and may *not* obtain habeas relief." (emphasis added)).

Beazley asserts that the Texas courts applied the wrong standard and decided contrary to clearly established federal law.

We agree with the district court that the proper interpretation of state law is *not* cognizable in federal habeas proceedings. To the extent Beazley raises a constitutional claim, we conclude that, regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, "meaningful appellate review" has been afforded. *See McFarland*, 928 S.W.2d at 498 (although court *cannot* conduct meaningful review of normative decisions on mitigation, it conducts meaningful review of objective evidence of future dangerousness).

5.

On direct appeal, Beazley asserted he was denied an impartial jury in violation of the Sixth and Fourteenth Amendments due to the exclusion of black jurors through peremptory challenges. The Court of Criminal Appeals concluded: sufficient race-neutral explanations existed for the exclusion; and the trial judge's decision was *not* clearly erroneous.

After setting out the standard under *Batson v. Kentucky*, 476 U.S. 79 (1986), and noting that the state court's factual findings are entitled to great deference, the district court summarized the *voir dire* record and concluded, correctly, that the claim was without merit.

6.

On state habeas, Beazley claimed another violation of the Sixth and Fourteenth Amendments by the exclusion of jurors because

of their opposition to the death penalty.  Here, *only* exclusion of juror Shirley is raised.

The state court concluded:  Shirley was a vacillating juror; and the record supported her exclusion.  Beazley maintains that decision was an unreasonable application of federal law.

The district court rejected this claim, citing the standard from **Wainwright v. Witt**, 469 U.S. 412, 424 (1985) (quoting **Adams v. Texas**, 448 U.S. 38, 45 (1980)):  "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'".  Beazley contends the district court erroneously placed the burden upon him to prove Shirley would follow instructions without such impairment.

"A trial judge's finding of bias during voir dire is a determination of fact, subject to a presumption of correctness on collateral review."  **Fuller v. Johnson**, 114 F.3d 491, 500-01 (5th Cir.), *cert. denied*, 522 U.S. 963 (1997).  Therefore, Beazley had the burden of refuting that finding.

For this claim, Beazley asserts that the state court decision was also an unreasonable determination of the facts under § 2254(d)(2).  Because this aspect of the claim falls outside the issue certified by the district court, we reserve further discussion for part II.B.2.

7.

22

On direct appeal, Beazley maintained that the Eighth and Fourteenth Amendments, at the very least, required, *at the punishment phase*, a limiting instruction to disregard unadjudicated extraneous offenses unless proved beyond a reasonable doubt. Citing **McFarland**, 928 S.W.2d at 512, the Court of Criminal Appeals ruled it "has long held that unadjudicated offenses are admissible during the *punishment phase* of a capital murder trial and their admission does *not* violate an accused's constitutional rights to due process or equal protection". (Emphasis added.)

The district court concluded that the Colemans' testimony concerned a sequence of events that led up to the crime and did *not* reflect inadmissable prior bad acts. Beazley maintains the district court misconstrued the record because the Colemans testified about bad acts *prior to and after the offense*, including alleged threats by Beazley against them and others.

Although the threats did *not* precede the offense, they were part of the sequence of events surrounding the crime, relevant to the questions of Beazley's remorse and future dangerousness. *See* **Williams v. Lynaugh**, 814 F.2d 205, 208 (5th Cir.) ("Evidence of ... unadjudicated crimes is clearly relevant to the jury's task of determining whether there is a probability that [the defendant] would continue to commit acts of violence as required by [the] special [interrogatory]."), *cert. denied*, 484 U.S. 935 (1987). "[T]he admission of unadjudicated offenses in the *punishment phase*

23

of a capital trial does *not* violate the eighth and fourteenth amendments." ***Id.*** (emphasis added).

> The authorities do *not* support [petitioner's] claim that the Constitution requires that the state prove unadjudicated offenses beyond a reasonable doubt before they may be used during the *sentencing phase*. Fully aware that the due process clause clearly requires that for conviction the state must prove the elements of the offense charged beyond a reasonable doubt, neither we nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated offenses in a capital case sentencing hearing.

***Harris v. Johnson***, 81 F.3d 535, 541 (5th Cir.) (emphasis added; citations omitted), *cert. denied*, 517 U.S. 1227 (1996).

Beazley's claim is also ***Teague***-barred. *See **id.*** (challenge to admission of unadjudicated extraneous offenses during *punishment phase* as violation of Eighth Amendment, due process, and equal protection is ***Teague***-barred).

B.

The district court having granted a COA *only* for the issue discussed *supra* (standard of review under § 2254(d)(1)), Beazley requests we grant a COA for 13 claims, only four of which (included in the above-discussed seven issues) have been exhausted. *See* 28 U.S.C. § 2253(c)(1)(A) ("circuit justice or judge" must grant COA for appeal to court of appeals).

A COA will *not* be granted unless the petitioner makes "a substantial showing of the denial of a constitutional right". ***Id.***

24

§ 2253(c)(2). This standard "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further". *Slack v. McDaniel*, 120 S. Ct. 1595, 1603-04 (2000) (internal quotation marks and citation omitted). Restated, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong". *Id.* at 1604.

On the other hand, *Slack* provides a two-prong test when the denial of relief is based on *procedural grounds* (*Slack* two-prong test): the petitioner must show *not only* that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right", *but also* that they "would find it debatable whether the district court was correct in its procedural ruling". *Id.* (emphasis added); *see* **Hernandez v. Johnson**, 213 F.3d 243, 248 (5th Cir.) (quoting *Slack*), *cert. denied*, 121 S. Ct. 400 (2000).

In considering the claims for which Beazley requests a COA from our court, we begin with those raised for the first time in federal court (which therefore are procedurally barred) and then consider those that procedurally are properly before us. Each COA request is denied.

25

1.

The claims found procedurally barred are discussed in subparts a. through i. of this part.  For each, Beazley fails to satisfy the *Slack* two-prong test.

Under 28 U.S.C. § 2254(b)(1)(A), a court shall *not* grant habeas relief unless "the applicant has exhausted the remedies available in the courts of the State".

> The requirements of the exhaustion concept are simple:  An applicant must fairly apprise the highest court of his state of the federal rights which were allegedly violated.  Further, the applicant must present his claims in a procedurally correct manner.  If, for whatever reason, an applicant bypasses the appellate processes of his state – whether through procedural default or otherwise – he will *not* be deemed to have met the exhaustion requirement absent a showing of one of two particulars.  He must either demonstrate cause and prejudice *or* show that the failure to consider his claims will result in a fundamental miscarriage of justice.

*Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993) (emphasis added; internal quotation marks and citations omitted).

Texas prohibits successive writs except in narrow circumstances.  TEX. CODE CRIM. PROC. ANN.  art. 11.071 § 5 (Vernon Supp. 2001).  Under § 5, unless Beazley presents a factual or legal basis for a claim that was previously unavailable *or* shows by a preponderance of the evidence that, but for a violation of the United States Constitution, *no* rational juror would have found for the State, Beazley is procedurally barred from returning to the

26

Texas courts to exhaust his claims, *id.*, and therefore is also procedurally barred in federal court.

a.

At the time of the murder, Beazley was three months short of his eighteenth birthday. The International Covenant on Civil and Political Rights (ICCPR) provides, *inter alia*: a "[s]entence of death shall *not* be imposed for crimes committed by persons below eighteen years of age". International Covenant on Civil and Political Rights, *opened for signature* 19 Dec. 1966, art. 6, para. 5, S. EXEC. DOC. E, 95-2, at 23 (1978), 999 U.N.T.S. 171, 175 [hereinafter ICCPR] (emphasis added). In 1992, the United States Senate ratified the ICCPR with various reservations, understandings, declarations, and a proviso, stating in pertinent part:

> [T]he United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, *including such punishment for crimes committed by persons below eighteen years of age*.
>
> ....
>
> [T]he United States declares that the provisions of Articles 1 through 27 of the [ICCPR] *are not self-executing*.

138 CONG. REC. S4783-84 (statement of presiding officer of resolution of ratification) (emphasis added).

Beazley maintains that article 6(5) of the ICCPR voids § 8.07(d) of the Texas Penal Code. That section provides: if a person was at least age 17 when he committed a capital offense, he can receive the death penalty. TEX. PENAL CODE § 8.07 (Vernon 1994).

(1)

Beazley did *not* raise this issue in either his direct appeal or his state habeas petition. Because Texas would preclude a successive state habeas claim, the claim is procedurally barred for failure to exhaust. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (State need *not* explicitly apply procedural bar "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred").

There is, however, a "cause and prejudice" exception to the bar for failure to exhaust. "When the ground upon which the petitioner relies for habeas relief was *not* exhausted in state court and state procedural rules *would bar* subsequent presentation of the argument, this court may *not* consider the claim absent 'cause' and 'prejudice'". *Little v. Johnson*, 162 F.3d 855, 859 (5th Cir. 1998) (emphasis added), *cert. denied*, 526 U.S. 1118 (1999). Beazley contends he has shown such cause and prejudice. He asserts "cause" in that the novelty of the claim made it reasonably unavailable to prior counsel; and he maintains prejudice

28

is "obvious" in that, but for this error, he would *not* have received the death sentence. *See* **Reed v. Ross**, 468 U.S. 1, 16 (1984) (petitioner shows cause if claim "so novel that its legal basis [was] *not* reasonably available to counsel" (emphasis added)).

The Senate ratified the ICCPR in 1992; Beazley's trial was in early 1995; and he filed for state habeas relief in June 1997. Therefore, the claim was available to him throughout his state court proceedings.

Notwithstanding the Senate's 1992 ratification, Beazley asserts the claim was "novel" at the time of his trial in 1995, prior to the United Nations Human Rights Committee's (HRC's) supposedly finding the reservation "void". However, he cites *no* specific ruling that the reservation was void, but apparently piggybacks several HRC statements.

In April 1994, the HRC issued a General Comment on reservations to the ICCPR:

> The Covenant neither prohibits reservations nor mentions any type of permitted reservation.... [W]here a reservation is *not* prohibited by the treaty or falls within the specified permitted categories, a State may make a reservation provided it is *not* incompatible with the object and purpose of the treaty.... Reservations that offend *peremptory norms* would *not* be compatible with the object and purpose of the Covenant.... *Accordingly, a State may not reserve the right* ... *to execute* ... *children*.... The *normal consequence* of an unacceptable reservation is *not* that the Covenant will *not* be in effect at all for a reserving party. Rather, such a reservation will *generally* be severable, in

29

the sense that the Covenant will be operative for the reserving party without benefit of the reservation.

*See General Comment 24, General Comment on Issues Relating to Reservations Made upon Ratification or Accession to the Covenant or the Optional Protocols Thereto, or in Relation to Declarations Under Article 41 of the Covenant*, U.N. GAOR Human Rights Comm., 52d Sess., ¶¶ 5, 6, 8, 18, U.N. Doc. CCPR/C/21/Rev.1/Add.6 (Nov. 1994) [hereinafter *General Comment*] (emphasis added).

In October 1995, the HRC expressed its "concern[]" that the United States Senate's reservation to article 6(5) was "incompatible with the object and purpose of the Covenant", and "*recommend[ed]* ... withdrawing ... [that] reservation[]". *See Annual General Assembly Report of the Human Rights Committee*, U.N. GAOR Human Rights Comm., 50th Sess., Supp. No. 40, ¶¶ 279, 292, U.N. Doc. A/50/40 (3 Oct. 1995) (emphasis added) [hereinafter *Report of HRC*].

Beazley's assertion of novelty fails for several reasons. First, even assuming *arguendo* the HRC's post-conviction statements in 1995 created a novel claim, state habeas counsel made *no* attempt to present the claim to the state courts two years later or to assert that the claim satisfied an exception to the procedural bar. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5 (creating exception for procedural bar if petitioner presents *previously unavailable* factual or legal basis of claim or shows by preponderance of

30

evidence that, but for violation of United States Constitution, *no* rational juror would have found for State).  In fact, Beazley's federal petition suggested Texas courts probably would have heard an ICCPR claim *even though* it had *not* been preserved through a contemporaneous objection at trial.

Furthermore, the claim the United States was *not* in compliance with article 6(5) was *no* more "available", **Reed**, 468 U.S. at 16, following the HRC's statement in 1995 than it was in 1992, when the Senate ratified the treaty *and* created the reservation.

Finally, perhaps it is arguable that an assertion that the United States is *not in compliance* with the treaty (a claim available in 1992) is distinct from a claim that the reservation is *void* (a claim Beazley asserts became available late in 1995). However, by simply "suggest[ing] and recommend[ing]" that the Senate withdraw the reservation, the HRC declined to attempt either to void or to sever the reservation.  Therefore, we need *not* reach the question of whether an HRC pronouncement that the reservation was void would create a novel claim, and we certainly need *not* address whether such a pronouncement would bind the United States.

In the light of the above, Beazley has failed to show cause for the procedural default.

In the alternative, Beazley claims excuse from procedural default under the first **Teague** exception, which allows retroactive application of new rules when they prohibit "a certain category of

31

punishment for a class of defendants because of their status or offense". *Penry*, 492 U.S. at 330. The *Teague* exception is *not* an exception to procedural default. Moreover, because Beazley did *not* make this contention in district court, it is *not* properly before us.

In the further alternative, Beazley asserts he is exonerated from procedural default under the "miscarriage of justice" exception, in that he is "innocent of the death penalty" because a condition of eligibility (age) has *not* been satisfied. *See Sawyer v. Whitley*, 505 U.S. 333, 345 & n.12 (1992). This exception applies "if petitioner has shown by *clear and convincing evidence* that but for constitutional error, *no* reasonable juror would find him eligible for the death penalty". *Sawyer*, 505 U.S. at 348 (emphasis added). Application of state law in conflict with a valid treaty would violate the Supremacy Clause, creating a constitutional error; but, as noted earlier and explained further below, *no* constitutional error exists because the treaty reservation expressly preserves capital punishment for a crime committed when under age 18.

Beazley cites his brief in the district court as a further explanation of his cause and prejudice contention. Because he did *not* explicitly make these arguments on appeal, we decline to consider them. *See Conkling v. Turner*, 18 F.3d 1285, 1299 n.14 (5th Cir. 1994) ("Attorneys cannot circumvent the ... page limit of

32

Federal Rule of Appellate Procedure 28(g) [now Rule 32] by incorporating by reference a trial memorandum."); *see also **Katz v. King***, 627 F.2d 568, 575 (1st Cir. 1980) ("If counsel desires our consideration of a particular argument, the argument must appear within the four corners of the brief filed in this court.").

### (2)

In his habeas petition, Beazley asserts that the Senate's ICCPR reservation is invalid and must be severed, based on his contention that the HRC has found it "void" for the reservation's violation of ICCPR's object and purpose. As discussed, the HRC has *not* found the reservation void, and the claim is procedurally barred; however, we address the question of the reservation's validity because it further supports our procedural-bar conclusion.

Two state supreme courts have addressed whether the ICCPR supersedes state law allowing execution for a crime committed while under age 18. Most recently, the Alabama Supreme Court concluded that the Senate's reservation had *not* been demonstrated illegal. *See **Ex parte Pressley***, 770 So. 2d 143, 148, 2000 WL 356347, at *5-7 (Ala.) ("We are not persuaded that [petitioner] has established that the Senate's express reservation of this nation's right to impose a penalty of death on juvenile offenders, in ratifying the ICCPR, is illegal."), *cert. denied*, 121 S. Ct. 313 (2000); *see also **Ex parte Burgess***, No. 1980810, 2000 WL 1006958, at *11 (Ala. 21 July 2000) (reaffirming reasoning and holding of ***Pressley***). And,

33

in *Domingues v. Nevada*, the Supreme Court of Nevada concluded that "the Senate's express reservation of the United States' right to impose a penalty of death on juvenile offenders negate[d] Domingues' claim that he was illegally sentenced". 114 Nev. 783, 785, 961 P.2d 1279, 1280 (1998), *cert. denied*, 528 U.S. 963 (1999).[1] We agree.

Furthermore, our court has recognized the validity of Senate reservations to the ICCPR. *See* *White v. Johnson*, 79 F.3d 432, 440 & n.2 (5th Cir.) ("[E]ven if we did consider the merits of this claim, we would do so under the Senate's reservation that the treaties [among them the ICCPR] only prohibit cruel and unusual punishment".), *cert. denied*, 519 U.S. 911 (1996); *cf.* *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1260 n.222 (M.D. Ala. 1998) ("[A]lthough international jurisprudence interpreting and applying the ICCPR would appear to assist this court, two sources preclude reliance on such precedent: the Supreme Court's directive in *Stanford v. Kentucky*[, 492 U.S. 361, 369 n.1 (1989) (American conceptions of decency are dispositive)]; and the reservations attached to the ICCPR.").

---

[1]Needless to say, the Supreme Court's denial of certiorari is *not* an expression of an opinion on the merits of the case. *See, e.g.,* *Carpenter v. Gomez*, 516 U.S. 981, 981 (1995) (opinion of Stevens, J., respecting denial of certiorari). This notwithstanding, it is at least noteworthy that, after requesting a brief from the Solicitor General on Domingues' petition for certiorari, *Domingues v. Nevada*, 526 U.S. 1156 (mem.) (1999), the Court denied certiorari, 528 U.S. 963 (1999).

In claiming that the reservation is invalid, Beazley cites a declaration to the ICCPR:

> [T]he United States declares that it accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims that another State Party is *not* fulfilling its obligations under the Covenant[.]

138 CONG. REC. S4784 (1992) (statement of presiding officer of resolution of ratification) (emphasis added). But, this declaration, while acknowledging the HRC, does *not* bind the United States to its decisions.

Beazley asserts that other courts have found the HRC's interpretation of the ICCPR persuasive. *See, e.g.*, **United States v. Duarte-Acero**, 208 F.3d 1282, 1287 (11th Cir. 2000) (looking to HRC's guidance as "most important[]" component in interpreting ICCPR claim (brackets omitted)); **United States v. Benitez**, 28 F. Supp. 2d 1361, 1364 (S.D. Fla. 1998) (finding HRC's interpretation of ICCPR article 14(7) helpful). However, these courts looked to the HRC only for guidance, *not* to void an action by the Senate. *See* **Duarte-Acero**, 208 F.3d at 1285 (finding appellant's contention contradicted by plain language and legislative history and HRC's interpretation, *all of which were in agreement*).[2]

---

[2]*Dictum* in **United States v. Bakeas** provides: "Although the United States sought to 'clarify' that it would be bound by its own understanding of discrimination [in the ICCPR], rather than that of the international community, the [HRC] has the ultimate authority to decide whether parties' clarifications or reservations have any effect". 987 F. Supp. 44, 46 n.4 (D. Mass. 1997). In addition to

35

In the light of our analysis, the reservation is valid. Accordingly, we could dispense with, as moot, Beazley's contention that the ICCPR is self-executing; however, we consider it briefly. As quoted above, the Senate ratified the ICCPR with a declaration that articles 1 to 27 were *not* self-executing. Beazley claims this declaration is trumped by article 50 of the ICCPR, which states: "The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions". ICCPR, art. 50. He maintains also that various statutory provisions constitute enabling statutes to allow private rights of action.

The claim that the Senate, in ratifying the treaty, voided its own attached declaration is nonsensical, to say the very least. The Senate's intent was clear — the treaty is *not* self-executing. *See* **Duarte-Acero**, 208 F.3d at 1285 ("If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, our analysis ends there and we apply the words of the treaty as written."). "'Non-selfexecuting' means that absent any further actions by the Congress to incorporate them into domestic law, the courts may *not* enforce them." **Jama v. I.N.S.**, 22 F. Supp. 2d 353, 365 (D.N.J. 1998) (emphasis added).

---

this being *dictum*, **Bakeas** cites *no* authority other than a law journal article.

Moreover, although Beazley cites *no* case law supporting the proposition that the treaty *is* self-executing, many courts have found it *is not*. *See, e.g.*, ***Igartua De La Rosa v. United States***, 32 F.3d 8, 10 n.1 (1st Cir. 1994) ("Articles 1 through 27 of the Covenant were *not* self-executing, and could *not* therefore give rise to privately enforceable rights under United States law". (emphasis added; citation omitted)), *cert. denied*, 514 U.S. 1049 (1995); ***Ralk v. Lincoln County***, 81 F. Supp. 2d 1372, 1380 (S.D. Ga. 2000) (neither legislative nor executive branch intended ICCPR to be self-executing); ***Jama***, 22 F. Supp. 2d at 365 (ICCPR *not* self-executing); ***White v. Paulsen***, 997 F. Supp. 1380, 1387 (E.D. Wash. 1998) (ICCPR *not* self-executing treaty that gives rise to private cause of action). The reservation is an express exception to article 50; restated, article 50 does *not* void the Senate's express intent.

In sum, Beazley presents *no* legal basis of a claim that was previously unavailable; nor does a preponderance of evidence show that, but for violation of the United States Constitution, *no* rational juror would have found for the State. Accordingly, Beazley is procedurally barred from returning to the Texas courts to exhaust his ICCPR claim. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5. Therefore, he is also procedurally barred in federal court. Because he has failed to show either cause and prejudice for *not*

raising the claim in state court or a fundamental miscarriage of justice, he is *not* excused from the default.

b.

Beazley asserts the denial of habeas relief on the grounds of the peremptory norms of customary international law was "contrary to" clearly established Supreme Court authority because it "mischaracterize[d] at best the appropriate rule, made clear by [the Supreme Court]". However, he fails to explain why the decision was incorrect or to cite a supporting Supreme Court rule; furthermore, because the claim is procedurally barred, we need *not* even reach the application of § 2254(d).

Beazley makes the same claim of cause and prejudice as he did regarding the procedural default of his ICCPR claim, and he also asserts miscarriage of justice. Just as he failed to establish an exception to the procedural bar for that claim, he fails to do so for this one.

As noted, the district court found the claim *not only* procedurally barred *but also* without merit. Courts look to the norms of international law "only where there is *no* treaty and *no* controlling executive or legislative act or judicial decision". ***Gisbert v. U.S. Attorney Gen.***, 988 F.2d 1437, 1447 (5th Cir. 1993) (emphasis added; internal quotation marks and citations omitted). The district court held that, because the Senate placed reservations on the ICCPR, and the Supreme Court has allowed the

38

execution of those who committed crimes at age 16, *see* **Stanford**, 492 U.S. at 370-73 (concluding that imposition of capital punishment for crime committed at 16 or 17 years of age was *not* cruel and unusual under Eighth Amendment), the norms of international law are *not* controlling. The district court also found that the norms Beazley referenced were *not* shown to be either valid or reliable.

Beazley asserts that the district court abused its discretion by refusing a hearing on whether the norms he referenced were valid. Because we deny a COA, we do *not* reach the norms' reliability.

c.

Beazley claims his sentence violates the Eighth and Fourteenth Amendments because he was 17 at the time of the offense. The district court found the claim procedurally barred, and also stated it was bound by Supreme Court precedent.

Beazley again asserts: the novelty of the claim constitutes "cause" for this procedural default and prejudice obviously resulted; and, in the alternative, the miscarriage of justice exception applies. But this claim is even more clearly barred than the previous. He *cannot* suggest the claim was novel or that refusing to hear it is a miscarriage of justice, because, as noted, over ten years ago, long before Beazley's trial in 1995, the Supreme Court found constitutional laws authorizing the death

penalty for those under age 18.  *See* **Stanford**, 492 U.S. at 370-73 (imposition of capital punishment for crime committed at age 16 or 17 *not* cruel and unusual); **Graham v. Collins**, 950 F.2d 1009, 1030 & n.25 (5th Cir.) (en banc) (citing **Stanford**), *cert. granted*, 504 U.S. 972 (1992), *aff'd*, 506 U.S. 461 (1993).

Beazley asserts that vast changes require revisiting this issue.  Obviously, we are bound by Supreme Court precedent.

### d.

As explained earlier, Beazley maintains appellate counsel was ineffective in failing to challenge the allowance of victim character evidence.  That claim was exhausted; and, in Part II.A.1, we considered it on the merits and denied relief.

However, in a footnote in his appellate brief, Beazley "separately seeks [a] COA ... [for the alleged] violation of fundamental fairness by the prosecution's use of the victim good character testimony if this Court may find exhaustion excused".  Beazley suggests *no* basis on which exhaustion could be excused.

### e.

Beazley also claims that a longstanding pattern of discrimination in Smith County, Texas, in the selection of grand jury forepersons, violated his equal protection rights.  The claim is procedurally barred – it was *not* exhausted in state courts, or even raised at trial, contrary to Texas' contemporaneous objection rule.  *See* TEX. CODE CRIM. PROC. ANN. art. 19.27 (Vernon 1977);

40

*Nichols*, 69 F.3d at 1280 (finding unexhausted claims would be barred by Texas' contemporaneous objection rule, thus precluding federal review).

Beazley asserts, however, that his claim was "exhausted ... through other cases", such as ***Rousseau v. Texas,*** 855 S.W.2d 666 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 919 (1993), and ***Texas v. Lewis***, No. 71,887 (Tex. Crim. App. 16 June 1996) (unpublished).  He cites *no* authority for this vicarious exhaustion proposition.  Needless to say, the likelihood of failure of a claim in state court is *no* excuse for *not* presenting it there.  *See* ***Engle***, 456 U.S. at 130 ("If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may *not* bypass the state courts simply because he thinks they will be unsympathetic to the claim.  Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." (emphasis added; footnote and citations omitted)).

Next, Beazley asserts the claim is *not* subject to procedural default because it is a *structural error* for which a state court is an inadequate forum, citing ***Rose v. Mitchell***, 443 U.S. 545, 561 (1979).  His citation to ***Rose*** is out of context; it provides:

> [C]laims such as those pressed by respondents
> in this case concern allegations that the
> trial court itself violated the Fourteenth
> Amendment in the operation of the grand jury
> system.  In most such cases, as in this one,

41

> this same trial court will be the court that initially must decide the merits of such a claim, finding facts and applying the law to those facts.... There is a need in such cases to ensure that an independent means of obtaining review by a federal court is available on a broader basis than review only by this Court will permit. A federal forum must be available if a full and fair hearing of such claims is to be had.

*Id*. The Court made that statement in declining to extend the reasoning of *Stone v. Powell*, 428 U.S. 465 (1976), which forecloses habeas review of Fourth Amendment claims raised in state court, *not in creating an exception for procedural default*. *See Rose*, 443 U.S. at 560-51 ("a claim of discrimination in the selection of the grand jury differs so fundamentally from application on habeas of the Fourth Amendment exclusionary rule that the reasoning of *Stone v. Powell* should *not* be extended to foreclose habeas review of such claims in federal court" (emphasis added)). In *Rose*, the petitioner had objected to the grand jury process prior to trial and also on direct appeal, thereby exhausting the claim. *Id.* at 548-49. Therefore, procedural default is *not* excused.

In the alternative, Beazley seeks a remand for a hearing. And, he requests a COA on whether trial counsel's failure to challenge the grand jury process denied him effective assistance of counsel. Because both single-sentence requests were made in a footnote, they are inadequately briefed and make *no* showing of the denial of a constitutional right.

42

f.

Beazley asserts that at least one juror was motivated by racial animus in sentencing him to death. The district court found the claim procedurally barred by failure to exhaust it before the state courts, as well as without merit, because conclusory allegations are insufficient to raise a constitutional issue. Concerning the merits, Beazley failed to meet his "burden of proving the existence of purposeful discrimination ... [and] that the purposeful discrimination had a discriminatory effect on him". *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (internal quotation marks and citations omitted).

g.

In another claim raised for the first time in federal court, Beazley asserts the prosecutor knowingly presented false testimony regarding plea bargains with the Colemans. The district court found the claim both procedurally barred *and* without merit.

At Beazley's guilt-innocence and punishment phases, Cedric and Donald Coleman testified they did *not* receive any promises of a plea bargain prior to their testimony. In their subsequent state trials, they received life sentences consecutive to the federal sentences they had received prior to Beazley's state trial.

In affidavits submitted with Beazley's habeas petition, both Colemans refer to deals with the prosecution; but, the district court found those affidavits did *not* reflect false testimony was

43

presented at trial.  According to the district court, the Colemans'
attorneys gave affidavits stating that *no* plea offer or leniency
offer ever was made or accepted.  And, the prosecutor in Beazley's
case submitted a similar affidavit.

h.

Beazley refers to federal habeas claims of denial of due
process resulting from the prosecutor's suppression of mitigating
evidence and from misleading testimony, concerning deals for
leniency made with the Colemans and Beazley's remorse for the
offense.  He did *not* raise this in the state courts; therefore, it
is procedurally barred.

The district court also concluded it was without merit,
finding *no* evidence of knowing suppression and that Beazley was in
the best position to provide testimony regarding his remorse,
citing ***Brady v. Maryland***, 373 U.S. 83, 87 (1963); ***Edmond v.
Collins***, 8 F.3d 290, 293 (5th Cir. 1993); ***United States v.
Stephens***, 964 F.2d 424, 435 (5th Cir. 1992); and ***United States v.
Bagley***, 473 U.S. 667, 682 (1985).  Although Beazley maintains here
that the district court reached the wrong conclusion, he briefed
the claim primarily in a footnote and gives *no* basis for his
assertion of "intentional suppression".

i.

In a final attempt to preclude procedural default, Beazley
suggests that the *ineffectiveness of state process* excused him from

44

exhausting claims in state court. Citing 28 U.S.C. § 2254(b)(1)(B)(ii) (exhaustion excused if "circumstances exist that render such process ineffective to protect the rights of the applicant"), he insists the district court erred in failing to grant discovery and a hearing on the issue of ineffective process and on claims presented for the first time in federal court.

In his brief to our court, Beazley claims meaningful post-conviction review was rendered impossible by the Court of Criminal Appeals' giving Beazley's habeas counsel and his partner five capital habeas cases each, briefs in all of which were due in six months. It is *not* clear that Beazley raised this *ineffective state process* contention in district court, although he did maintain *ineffectiveness of habeas counsel* was cause for his procedural default. We will assume *arguendo* that ineffectiveness of habeas counsel might be construed as raising *ineffective process*, if the ineffectiveness is *structural*, as Beazley alleges. But, to the extent Beazley now raises this claim for the first time, we *cannot* consider it. *E.g.*, **United States v. Samuels**, 59 F.3d 526, 529-30 (5th Cir. 1995) ("Short of a miscarriage of justice, we may *not* consider an issue raised for the first time on appeal of a section 2255 motion." (emphasis added)); **United States v. Smith**, 915 F.2d 959, 964 (5th Cir. 1990) (per curiam) ("If the defendant in habeas proceedings did *not* raise his claims before the district court, we do *not* consider them on appeal." (emphasis added)).

45

Because the district court did reach the question of ineffectiveness of habeas counsel, we first address it. However, we easily conclude that the district court properly dismissed, as without merit, any claim of ineffective assistance of habeas counsel as "cause" for procedural default, citing *Mackall v. Angelone*, 131 F.3d 442, 446 (4th Cir. 1997) (alleged ineffective assistance of counsel in petitioner's first state habeas proceeding did *not* constitute cause for failure previously to raise claim), *cert. denied*, 522 U.S. 1100 (1998). In addition, to the extent Beazley asserts his attorney rendered ineffective assistance because the *state habeas system* precluded effective representation, his claim is barred by 28 U.S.C. § 2254(i): "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall *not* be a ground for relief in a proceeding arising under section 2254". (Emphasis added.)

Moreover, as reflected in the bar raised by § 2254(i), *no constitutional right* to habeas counsel in state collateral proceedings exists, so Beazley *cannot* claim a constitutional violation. *See Fairman v. Anderson*, 188 F.3d 635, 643 (5th Cir. 1999) ("[B]ecause appointment of counsel on state habeas is *not constitutionally required*, any error committed by an attorney in such a proceeding 'cannot be constitutionally ineffective'". (quoting *Coleman*, 501 U.S. at 752) (emphasis added)).

46

Turning to the *broader issue* of *ineffective state process*, and assuming *arguendo* Beazley properly presented the claim to the district court, "infirmities in state habeas proceedings do *not* constitute grounds for relief in federal court". ***Trevino v. Johnson***, 168 F.3d 173, 180 (5th Cir.) (emphasis added; internal quotation marks and citations omitted) (citing Fifth Circuit and other circuits), *cert. denied*, 527 U.S. 1056 (1999); ***Vail v. Procunier***, 747 F.2d 277, 277 (5th Cir. 1984).

Because Beazley has *not* made a substantial showing of the denial of a constitutional right, his request for a hearing on the issue is moot. In any event, he has *not* even attempted to show why the claim is *not* barred by 28 U.S.C. § 2254(e)(2), discussed below, for failure to develop the factual basis of the claim in state court proceedings.

2.

Beazley requests a COA for four of the claims addressed by (exhausted in) the state court: ineffective assistance of counsel for failure to object to victim character evidence; violation of the Eighth and Fourteenth Amendments by the jury instruction regarding mitigating evidence; violation of the Sixth and Fourteenth Amendments by exclusion of jurors for opposition to the death penalty; and violation of the Eighth and Fourteenth Amendments by admission of uncorroborated prior bad acts and

47

unadjudicated extraneous offenses during sentencing.  As stated earlier, we refuse to grant a COA for any of these claims.

Only one issue falls outside those discussed *supra* in part II.A (applying standard of review for § 2254(d)(1)).  As noted earlier, Beazley asserts that the trial court's exclusion of a juror because of her opposition to the death penalty was, under 28 U.S.C. § 2254(d)(2), an unreasonable determination of the facts.  However, the district court concluded that the vacillating-juror finding was *not* unreasonable.

Beazley fails to refute the state court's finding.  For this reason and those stated in part II.A, he has failed to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong".  **Slack**, 120 S. Ct. at 1604.

## C.

Pursuant to **(Michael) Williams v. Taylor**, 120 S. Ct. 1479 (2000), Beazley seeks an evidentiary hearing on the impartiality *vel non* of two jurors, claiming his state habeas counsel made the reasonable attempt required by 28 U.S.C. § 2254(e)(2) to uncover supporting facts.  He maintains:  juror Herbst knew the victim, John Luttig, but the prosecutor's questioning intentionally avoided revealing this; and juror Jenkins was racially biased.  (The request to certify the racial-bias issue was denied *supra*.  And, Beazley does *not* request a COA for the acquaintance issue.  In any

48

event, both claims are procedurally barred by the failure to raise them in the state court.)

Section 2254(e)(2) precludes an evidentiary hearing in district court "[i]f the applicant has *failed* to develop the factual basis of a claim in State court proceedings," *unless* the applicant shows, *inter alia*:

> (A)  the claim relies on —
>
> ...
>
> (ii) a *factual predicate* that could *not* have been previously discovered through the *exercise of due diligence*; and
>
> (B) the *facts underlying the claim* would be sufficient to establish by *clear and convincing evidence* that but for constitutional error, *no* reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

The district court concluded that Beazley was *not* entitled to an evidentiary hearing.  In so ruling, it did *not* have the benefit of the recent *(Michael) Williams* decision.  However, it did have our decision in *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998), which *(Michael) Williams* notes had earlier reached the same holding.  120 S. Ct. at 1488.

*(Michael) Williams* concerned Williams' seeking evidentiary hearings on three claims raised for the first time in his federal habeas petition, including a claim, like Beazley's, that seating a

49

juror who did *not* reveal possible sources of bias rendered his trial unfair. 120 S. Ct. at 1486. Like Beazley, Williams maintained § 2254(e)(2) did *not* apply because, through *no* fault of his own, he was unaware of the underlying facts. *Id.* Williams conceded that his case did *not* fall within the exception created by § 2254(e)(2)(B) (underlying facts would *not* "establish by clear and convincing evidence that but for constitutional error", petitioner would *not* have been found guilty). He asserted, instead, that he did *not* even come within the section's first, preclusive condition (opening clause): "*failed* to develop the factual basis of a claim". *Id.* at 1487 (emphasis added). As in Beazley, state post-conviction relief was unavailable, but the Supreme Court found cause for the default regarding juror bias. *Id.* at 1494.

After discussing the meaning of the word "failed" in § 2254(e)(2)'s opening clause, the Court concluded: "Under the opening clause of § 2254(e)(2), a *failure* to develop the factual basis of a claim is *not* established *unless* there is lack of diligence, or some greater *fault*, attributable to the prisoner or the prisoner's counsel". *Id.* at 1488 (emphasis added) (noting agreement with our court's holding in **McDonald**, 139 F.3d at 1059). The Court observed that the *fault* requirement avoided creating tension with § 2254(d):

> If the opening clause of § 2254(e)(2) covers a request for an evidentiary hearing on a claim *which was pursued with diligence but remained*

*undeveloped in state court* because, for instance, the prosecution concealed the facts, a prisoner lacking clear and convincing evidence of innocence could be barred from a hearing on the claim *even if he could satisfy § 2254(d)*.

*Id.* at 1489 (emphasis added).  The Court further explained:

Diligence for purposes of the opening clause depends upon whether the prisoner made a *reasonable attempt*, in light of the information available at the time, to investigate and pursue claims in state court.... *Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.*

*Id.* at 1490 (emphasis added).

Regarding Michael Williams' **Brady** claim, the Court found state habeas counsel knew "details that *should have alerted* counsel to a possible ... claim".  *Id.* at 1491 (emphasis added).  "Given knowledge of the [facts and their] potential importance, a diligent attorney would have done more.  Counsel's *failure* to investigate these references in anything but a cursory manner *triggers the opening clause* of § 2254(e)(2)."  *Id.* at 1492 (emphasis added).

Michael Williams also claimed potential juror bias, as noted, and prosecutorial misconduct because a juror remained silent about her previous marriage to, and divorce from, a key witness, and about the prosecutor's representing her during that divorce proceeding, and also because the prosecutor did *not* reveal the information.  *Id.* at 1492.  The Supreme Court found *no* evidence in

51

the trial record that would have put a reasonable attorney on notice. *Id.* at 1493. Counsel had requested funds to investigate the jury because of suspicions about another juror, but the state court denied the funding. *Id.*

The Court found the funding-denial understandable in the light of petitioner's vague allegations, but found the vagueness was *not Williams' fault*. *Id.* It stated: "We do *not* suggest the State has an obligation to pay for investigation of as yet undeveloped claims; but if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings, § 2254(e)(2) will *not* bar him from developing them in federal court". *Id.* at 1494 (emphasis added).

Beazley asserts that his state habeas counsel made a "reasonable attempt" to develop the claims of juror racial bias and juror acquaintance with John Luttig. State habeas counsel requested funds to investigate juror and prosecutorial misconduct; funds were granted; and the investigator contacted the two jurors whose bias Beazley now asserts – Jenkins (alleged racial bias), and Herbst (alleged acquaintance with John Luttig). Beazley states that, although Herbst revealed nothing to the investigator, a basis for the claim against Jenkins was established. Beazley's state habeas attorney sought an extension of time to file his petition (the request did *not* specifically mention the racial-bias claim);

52

an extension was denied; and, in Beazley's state habeas petition, he failed to raise either claim.

We easily dispose of the racial-bias claim; Beazley *admits* his state habeas counsel was aware of a basis for it. Just as counsel to Michael Williams failed to raise a claim about which he had factual knowledge, Beazley's counsel knew of the possible racial bias and failed to raise the issue in state court. This failure does *not* evidence the requisite diligence necessary to avoid the bar imposed by § 2254(e)(2)'s opening clause.

Regarding Herbst's alleged acquaintance with John Luttig, Herbst testified at *voir dire* that she worked for Robert and Lester Henry. Beazley's *federal habeas counsel* discovered Robert Henry had a business relationship with John Luttig, as incorporators of a corporation, and Henry's son was a trustee for a portion of John Luttig's property. Beazley suggests the prosecutor attempted to hide Herbst's acquaintance with John Luttig because he did *not* ask if she knew him. However, *not only* did the prosecutor *not* ask this question, *defense counsel failed to do so as well*. Furthermore, when asked by defense counsel if anything else came to mind that Herbst might need to tell one of the parties if they had *not* asked the right questions, Herbst answered "no"; and, when asked if she could be a fair and impartial juror, she answered "yes".

Beazley asserts: "The evidence suggests a great likelihood that Herbst personally knew [John] Luttig". This is speculation.

53

Therefore, we find it difficult to "fault" state habeas counsel for not pursuing the claim further, after the investigator contacted Herbst post-trial (as discussed *supra*).

However, Beazley's "[c]urrent counsel [claims he] found the information by searching Secretary of State records on Lexis to ascertain whether there were any business relationships between the victim and jurors that had been undisclosed". This avenue of research, or a similar one, was presumably available to state habeas counsel. Moreover, Beazley has uncovered *no* evidence of actual acquaintance between Herbst and John Luttig – he relies solely on the business relationships evinced in the state records.

In *(Michael) Williams*, for the juror-bias issue the Court found fell outside § 2254(e)(2)'s opening clause, and for which, therefore, an evidentiary hearing was *not* barred in federal court, the juror and prosecutor both admitted to knowing that the juror's former husband would be testifying; but both thought they were no longer "related" after the divorce. *Id.* at 1492-93. Regarding the prosecutor's representation of the juror in the divorce proceeding, the juror stated in an affidavit that, because the divorce was uncontested, she did *not* think he had "represented" either party; and the prosecutor stated in his affidavit that he had forgotten it. *Id.*

In contrast, Beazley's federal habeas counsel has produced *no* similar evidence or affidavits that "could suggest to the finder of

54

fact an unwillingness to be forthcoming" or "failure to divulge material information in response to [a] question [that] was misleading as a matter of fact". *Id.* at 1493. Therefore, we find *no* abuse of discretion in the denial of an evidentiary hearing*. See McDonald*, 139 F.3d at 1059 ("Denials of an evidentiary hearing are reviewed for abuse of discretion").

## III.

For the foregoing reasons, for the issue for which the district court granted a COA, we **AFFIRM**, based on our conclusion that the denial of habeas relief was proper under the standard of review subsequently articulated in *Williams*; and, a COA is **DENIED** for each issue for which one is requested from our court. Therefore, the judgment denying habeas relief is **AFFIRMED***.*